or otherwise Flecker et al. v. Picard. Good morning, Your Honor. Thank you so much. The public respect for the court system compels rigid adherence to basic rules of evidence. If evidence is not reliable, it cannot be admitted and cannot be the basis of a judicial determination. In this case, despite the fact that the trustee had the burden of proof, the trustee did not put into evidence a complete set of the statements for the various accounts held by Mr. Flecker from 1981 on. On the contrary, he just put into evidence a very small proportion of the monthly statements. This omission speaks volumes because the only way it can be explained is that the trustee's complete set of the records did not support his position. We have claimed throughout the proceedings below that the trustee did not produce in discovery a complete set of the records. Indeed, the trustee initially claimed Flecker opened his first Madoff accounts in 1986. Years later, the trustee produced documents showing the accounts had been opened in 1981. It is undisputed that for the period in which the trustee has reliable third-party evidence, that is, from 1997 through 2008, that we're really litigating something that occurred 20 to 40 years ago. But in the period where the trustee has reliable third-party evidence, the evidence is undisputed that Mr. Flecker never took a withdrawal from his account. And he claims that he never took a withdrawal from 1981 on. He doesn't have to, does he, for it to be counted against him? If, in fact, money is moved into a separate account at his request, or that it can either be sent to him or moved to a separate account at his request, then under those circumstances, that eats into the net equity, doesn't it? It wouldn't if that account had money in it and he hadn't taken it out. His position and the position that his son testified to was that Mr. Flecker never, in the entire time he had a Madoff account, he never took a withdrawal. So if there had been another account into which, for some reason, Mr. Flecker had an arrangement with Mr. Madoff, which, of course, is impossible to know. Mr. Flecker was 106 at the time the case was tried. Obviously, someone who's 106 is not going to be able to remember something that occurred 40 years earlier. But for the entire time period, from 1997 through 2008, there is no third-party evidence of any kind, which there normally would be, that Mr. Flecker ever took a withdrawal. So the trustee is relying upon a profit withdrawal entry on certain of Mr. Madoff's statements. And I would ask the court to look at A1215, because if you look at this document, you can't tell that money was withdrawn. All that is indicated is it says check, Pep Boys, and then PW in another column, and then an amount. And Mr. Flecker testified that he understood that to be a check to Pep Boys for the purchase of security. The only evidence that the trustee put in was the actual statement. But we had a very difficult time getting a complete set of the statements. We never felt that we did. And there's no reason why the trustee would not have put in a complete set of the statements if they, in fact, supported his position. And it's important for the court to appreciate that with respect to a great number of clients, we put in evidence showing that they, in fact, had third-party evidence of withdrawals from the 1980s, because there would have been letters from the customers. Madoff required letters from the customers requesting withdrawals. There is no such letter from Flecker, even though there were records going back to the 1980s. Madoff's former employees testified that it was their practice to keep a copy of every check that represented a profit withdrawal. They kept copies of those checks in the customer's file. And we proved that with respect to other customers, even as early as the 1980s, Madoff had such copies of the checks. There were no copies of checks with respect to Flecker. You've made the point a little earlier that the trustee had the burden of proof here. And I wonder what authority you have for that. Well, his affirmative case is that Mr. Flecker took money out of his account. I thought the affirmative case was Flecker's, who was saying that he was entitled to some net equity that was left in the company. And he's the plaintiff, in effect, is he not? And so doesn't he then have the burden of showing that there is equity left? No, in a bankruptcy case, which this is, when a customer files a sworn proof of claim, which Mr. Flecker did, that's the initial burden of proof, which he met. The burden then shifts to the trustee to disprove the sworn statement of claim. And that is why, where the trustee failed to meet his burden, because if, in fact, all of the records supported the trustee's position, why didn't he put them into evidence? Now, there was a test. Go ahead. Judge Walker, please go ahead. No, I'm just wondering. I think it's more than just the actual records. I thought there was testimony from various BLMIS witnesses, employees, about these records and what they meant, and that that was what the trustee was relying on. Well, no, the court could not have relied upon the former employees because their testimony did not support the trustee. The former employees said, some of them said that they had no confidence in any of the records. Nobody had ever recalled Mr. Flecker. They consistently testified that if checks were sent to Mr. Flecker, copies of those checks would have been put in the files. That was not done. There was testimony that no customer was entitled to a withdrawal unless he sent a letter requesting withdrawals, and that they had those for every customer. They didn't have them for Mr. Flecker. Such records, such requests went in for other customers. And then there was testimony from a former employee that if someone wanted to go from receiving profits to not receiving profits, which, according to the trustee, happened in 1997, that had to be evidenced by a letter from the customer. Again, there was no record of such a letter in Mr. Flecker's file. So if you take the testimony of the former employees, you have to reach the conclusion that Mr. Flecker testified correctly that he never took any withdrawals. Your time is short, but what are we to make of Mr. Flecker's inaction over those 40 years of his receiving statement after statement after statement? And, of course, there was a 10-day clause in the 1992 customer agreement. But I'm having a hard time getting past his receipt and inaction in the face of these statements over a long time. And we're at an abuse of discretion review regarding evidentiary rulings. The district court and the bankruptcy court both have set forth very detailed and persuasive arguments suggesting that this amounts to ratification and that the trustee is within his authority in treating these profit withdrawals as having been acquiesced by Mr. Flecker. What is your view as the profound unlawfulness in that? Here's the problem, Your Honor. Mr. Flecker opened his account in 1981. We never got a complete set of the records. Initially, the trustee claimed that he had two accounts, and then it turned out he had eight or nine different accounts. There may have been 12 or 13 different accounts. Unfortunately, we don't have those records. But the point is, nobody saves records going back 40 years. So we had a situation where someone was being forced to prove what happened 40 years earlier. There's nothing in the law that allows someone to gain an advantage like that, particularly when the trustee has from day one insisted that the records are permeated with fraud. I agree with you. There is an explanation. But there's no basis for the explanation to be that Mr. Flecker agreed to take out all the profits because there was no evidence. There was no evidence that he took out profits, even the kind of evidence that Mr. Madoff's employees maintained. All right. You'll have two minutes of rebuttal. We'll hear from the trustee, please. Ms. Brown? Yes. May it please the court. Shawna Brown of Baker Hostetler on behalf of Urban Picard trustee. Your Honor, with me on the call today is my colleague from the Securities Investor Protection Corporation, Nathaniel Kelly. And if possible, we would like to divide the argument where I can address the evidentiary issues and the overall profit withdrawal issue, and Mr. Kelly can address ratification and the burden under SIPA to prove a claim. That's fine. I have you set for seven minutes and Mr. Kelly for three. Does that work? It does. Thank you, Your Honor. Very good. Please proceed. Thank you. So I'd like to just address two things right at the outset. One is this statement that we did not produce all of Mr. Blecker's records. And that claim was raised post-trial, and Judge Bernstein addressed it in his opinion. But what I'd like to point the court to is that the trustee produced summary exhibits that were admitted into evidence. His expert laid the foundation for them, and they were admitted into evidence at trial. In those summary exhibits listed by base number, every single customer statement that the trustee had in his possession that related to Mr. Blecker's account. So the notion that we did not produce the records or admit evidence at trial on them is false. And the second thing I would point out is that the employee testimony, it does, in fact, support the trustee. And if the court reviews the opinions of both Judge Bernstein and Judge Engelmeyer here, both courts relied extensively on that testimony. Those employees testified to the creation of the documents, how they were maintained, both in the time period that precedes, which I'm going to get to in a minute, that precedes the period for which we have bank records, as well as the time period for which we do have bank records. So let me turn to that very quickly, because I think the linchpin of this appeal is really the notion that the trustee's records are untrustworthy. And I think I can show you very quickly why that's not so. And so I think we have to start with the claim that there are no third-party records here. At Mr. Madoff's office, when the trustee was appointed, the trustee found customer account information, including cash data related to deposits and withdrawals going back to 1991. So it gave him 27 years of cash data. And from the outset, the trustee knew that we were dealing with a fraud here. So one of the very first things we did was we went to J.P. Morgan, which held the bank account for the customer money, and got bank records from J.P. Morgan. And we were able to get 10 years of bank records, which I think is quite remarkable. So for that 10-year period where the records overlapped, the bank records matched Madoff's cash data, the deposit withdrawal data, 99.999% of the time. And the one, the point, it's actually .006 that can't be reconciled. It's not because there was contradictory information. It's because the canceled checks were missing from J.P. Morgan. So that level of accuracy gave him confidence that he could rely on the debtor's books and records for purposes of determining a net equity claim in this case. And then turning to the profit withdrawal specifically, within that 10-year period, there were 5,500 profit withdrawal transactions. And again, we were able to match 99.6% of those transactions to the bank records, which included canceled checks that were written to customers, endorsed by customers, and deposited in their bank account. So I think that that level of accuracy gave us confidence in the 10-year period. So those records are undeniably trustworthy. And then when you pair that with the investigation that the trustee did of all of the debtor's books and records, that also confirmed that conclusion that profit withdrawals were cash withdrawals. For the preceding period, though, wasn't it lower, like 50-some percent? So doesn't that kind of raise the issue that your adversary is complaining about? Your Honor, you're correct. For the entire period, the entire 27-year period, going back to 1981, we were able to confirm about over 50% of the profit withdrawal transactions. So for that period, we had bank records. We had documents that we received from customers in litigation. We had documents, like correspondence that customers had written to BLMIS over that 27-year period, and other documents from customers in the files. And so while that number may seem lower, I think we have to remember that we're dealing with a fraud that spanned decades. And as this statement even pointed out, no one keeps records forever. So I actually think we have an incredible amount of records, given the time period that we're dealing with. And we have third-party records here. I mean, that 50% is tied to records from customers themselves. And as a bankruptcy court and the – sure. Judge Walker. Yes, Your Honor. Yeah, I just have a question. Regarding the records, you have a high level of confidence for the past 10 years, up to the time that you were doing this exercise, the 10 years previously. Did those records reflect Blecker's profit withdrawals at all? Mr. Blecker did not take any profit withdrawals in that 10-year period. He did not take any withdrawals at all. Right. So it was just the older period. It was the older period. So we – again, we relied on the fact that we had, you know, complete accuracy for that 10-year period. We also had the BLMIS employee testimony, which talked about the manner in which the documents were created over the entire period. And, you know, we looked at – there were certain documents that we did find in the debtor that did talk about Mr. Blecker specifically. So one of the documents that the bankruptcy court relied upon in its ruling was this thing called the checkout book. And many – at least two, if not more, of the BLMIS employees testified to this. And what the checkout book was is what it sounds like. It's a book that has checks written to customers. Mr. Blecker's name was in that book. And that amount – it lists the check amount and the date. And that amount tied exactly to the statement that was sent to Mr. Blecker. The BLMIS employees looked at that checkout book, testified about how it was created, how it was maintained, and verified that if Mr. Blecker's name appeared in there, he would have been set a check in that amount. And that's, in fact, what showed up on the cash records, the customer statements that Mr. Blecker, as Judge Carney pointed out, never objected to. So I think that, especially when we're talking about an abuse of discretion standard for these evidentiary rulings, I think that there's no abuse of discretion here. There was an ample basis for Judge Bernstein to make the rulings that he did. With the court's permission, I'd like to turn quickly to just a couple of points that I want to hit that explain why Mr. Blecker's claim denial should be upheld. And the first point I'd like to make is that Mr. Blecker says that the cash records aren't reliable, so therefore the trustee and the court cannot use them to deny his claim. But the cash records are the only evidence that Mr. Blecker has to support his deposit, which is what he needs under SIPA to support his claim. So I don't think the cash records are that unreliable. You have one minute left. Okay. And then the second point is that Mr. Blecker's account had less than 1% of appreciation over the length of the period that they were open. And the only rational explanation for why that would be so, as the Bankruptcy Court found and laid out in its opinion, is that Mr. Blecker was withdrawing the profits in the form of profit withdrawals. That's really the only explanation. Otherwise, his balances should have been going up over time, and as a CPA, he certainly should have caught that. And the last point I'll make is that Mr. Blecker does not challenge the overall ruling here, in that the Bankruptcy Court found that profit withdrawals are cash withdrawals and debits in the net equity calculation. He says that only he, he alone, is the only person that didn't receive them. But there's no evidence in the record that Mr. Blecker's accounts were treated any differently than other account holders, and, in fact, the evidence shows just the opposite. So I think, Your Honors, that under any – I know the appellants have been arguing about the proper standard of review here, but I would say that under any standard of review, the bankruptcy decision must be upheld. He carefully – the bankruptcy judge carefully applied the federal rules of evidence. He did not relax them in any way because it was a SIPRA proceeding, and he had an extensive record, expert testimony, employee testimony. The testimony of Mr. Blecker and his son, which he deemed not credible, all of the documents admitted to evidence, and on the basis of that entire record was the conclusion that he came to, which is amply supported and was in no way either an abuse of discretion or a clear error. Thank you. Thank you very much, Ms. Brown. We'll go here for Mr. Kelly. Good morning, and may it please the Court, Nathaniel Kelly for Intervenor Securities Investor Protection Corporation. As SIPIC looks forward to future liquidations, the law should be clear, one, that a customer bears the burden of proving the amount of his net equity, and, two, that a customer's delay in objecting to a transaction ratifies it, and he can't claim that he never received a withdrawal listed on an account statement from 10 years prior. Turning first to burden, to qualify for priority customer protection, customer status is only the threshold determination. As in a regular case under the Bankruptcy Code, a customer bears the ultimate burden of proof as to the validity, extent, and amount of the claim, measured as the net equity in the customer's account. A customer must establish his net equity as of the liquidation filing date, which necessarily involves proving not only deposits but also subsequent transactions, including withdrawals. A customer must prove each transaction. Why should we reach this certain issue? I mean, doesn't it depend on the case and the circumstances? Like here, we were just talking about how reliable the records or verifiable the records are. If we're dealing with a situation involving fraud, that introduces another problem. So shouldn't we just leave it case by case? Well, I think, Your Honor, both the District Court and the Bankruptcy Court found that regardless of burden, the trustee has proven his case. So you're correct that we don't necessarily need to reach the issue of burden in this particular matter, but it's important to make it clear for future Lucipa liquidations that a customer still bears the ultimate burden of proof, very similar to the Bankruptcy Code standard. And any claimant, any plaintiff, the claimant's affirmative case, as Judge Walker alluded to, is net equity. So that's his burden to bear. And where the claimant below has made the argument that he only needs to prove his customer status and not the amount of his net equity, it's important to make it clear for future liquidations that that is not the case. If you have a minute, Mr. Kelly, could you please address the delay question? What amount of delay is enough? We had the 10-day period of the customer agreement, and here we have a delay of, you know, decades, ultimately. But it's a little hard to establish a rule. What articulation would you propose? Your Honor, I think that may have to be on a case-by-case basis, depending upon customer sophistication, the clarity of the statements. But here I think 10 years is more than sufficient. There's one case out of the Southern District of New York that found a two-year delay was sufficient for ratification. And I think the 10-day clause for written objections is fairly standard in the industry now. So most cases of ratification will come down to those 10 days. It's really like lachies, isn't it? I mean, it's like a delay that really should dictate an outcome based upon whether the delay could be said to have been unreasonable. Isn't that really what we're talking about, trying to give some – you would ask us to give some shape to that notion? Yes, Your Honor. It is similar to that. And like lachies, it has – the delay has placed the debtor or the trustee in this case in an unreasonable position because it has him trying to disprove an assertion from over 10 years ago when records have been lost. Yeah. All right. Thank you. Thank you. Your time has expired. We'll hear from Ms. Chapman. You have two minutes for rebuttal. Thank you. You know, I think we should not lose sight of the fact that the Securities Investor Protection Act expressly provides that a customer's claim is the balance on their last statement. So by statute, it's the statement that establishes the claim. Now, what happened here – and, of course, that claim included the profits that were shown on the statement. What happened here, of course, is that because the trustee represented that there was never any trading of any securities in any of the accounts, that the Second Circuit made the decision to eliminate all appreciation in the accounts. We're not saying that there was a mistake on the statements that actually went to Mr. Bleffer that have been produced. What we're saying is we don't believe we've ever received all the statements. And, unfortunately, by the time Mr. Bleffer became involved in the liquidation proceeding, he was over 100 years old and didn't have the ability to recall precisely what had happened. What we believe is that there were other accounts that Mr. Bleffer maintained where the profits – if, in fact, the profits were deposited, they would have been deposited in one of these other accounts. And although there's a dispute about the completeness of the production, if the trustee had put those documents in evidence, there wouldn't be a dispute. But our review was always that there were vast deficiencies in the production and, most significantly, that it took four years for the trustee, after his initial production, to produce account records for accounts of which we had been unaware. So, really, the issue here is, can the court rely upon evidence where the trustee himself admits that the evidence is not reliable? These records are not reliable and they were not complete. Thank you very much. Your time has expired. Thank you. I think I have no arguments, and we will reserve the session.